IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM GAIRLOCH | : | Civ. No.  4:13-CV-00900 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY, | : | |
| Defendant. | : | |

**MEMORANDUM**
January 7, 2015

Plaintiff William Gairloch ("Plaintiff" or "Gairloch") alleges that he was

retaliated against for complaining about unlawful age discrimination to The

Pennsylvania State University's Affirmative Action Office (AAO) and filing a

series of charges with the Pennsylvania Human Relations Commission (PHRC)

and the Equal Employment Opportunity Commission (EEOC).  This Court has

jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §

621 et seq., and has jurisdiction over the state law claims pursuant to 28 U.S.C. §

1367.

Defendant The Pennsylvania State University ("Defendant" or "Penn State")

filed a Motion for Summary Judgment (ECF No. 22).  The Parties briefed the

issues and they are now ripe for resolution.  Because Gairloch failed to establish a

1

*prima facie* case of retaliation for his complaints of unlawful age discrimination, Penn State's Motion for Summary Judgment is granted and the case is dismissed.

## I.    BACKGROUND

Generally, Gairloch alleges that he was retaliated against for complaining about unlawful age discrimination to Penn State's Affirmative Action Office (AAO), and filing a series of charges with the Pennsylvania Human Relations Commission (PHRC) and the Equal Employment Opportunity Commission (EEOC).  The specific complaints of retaliation include allegations that Penn State gave Gairloch a poor performance evaluation, subjected him to a Performance Improvement Plan (PIP), terminated his telecommuting privileges, and ultimately terminated his employment in March 2012.  More detailed facts for the purposes of summary judgment are as follows.

Gairloch testified that he began to work as a data engineer under Kurt Jeschke, his manager, in approximately 2008.  Gairloch submits that he worked for Jeschke to the best of his ability, but from the outset he did not believe that Jeschke was a good manager because he was a poor communicator.  Pl.'s SOF, ¶ 6. Jeschke asserts that he initially became concerned about Gairloch's poor job performance in February 2009, because he noticed that Gairloch had only completed about one-third of the "work orders" of his peers for calendar year 2008.

2

Def.'s SOF, ¶ 7.  Gairloch counters this assertion by demonstrating that Jeschke

authored favorable job evaluations for his performance in 2008 and 2009.  See

Pl.'s SOF, Ex. 3.

During Gairloch's tenure under Jeschke, the group Jeschke oversaw had four

Level 3 System Design Specialists (or Systems Engineers) of which Gairloch was

one.  These Level 3 engineers "would get the more complicated designs, mostly

because [they] were there the longest, [and they] had the most knowledge."  Def.'s

SOF, ¶ 10.  Of the four Level 3 engineers, three of them, including Gairloch, are

approximately the same age, as they were born within eleven months of one

another.  Id. ¶ 11.

In 2009 and 2010, Jeschke began to grow concerned that Gairloch was often

not available or could not be located in the office, and that he heavily utilized his

allowed telecommuting time.  Def.'s SOF, ¶ 13–14.  Gairloch would apparently

telecommute about 25% of his working time.  Id. ¶ 17.  Jeschke asserts that no

other employees in the group that he managed telecommuted to that extent.  Id. ¶

18.  Telecommuting was allowed and available for employees of the Information

Technology Department, of which Gairloch was a part.  Jeschke asserts, however,

that only a few of his employees ever telecommuted, that it was done on an

emergency as-needed basis, and that it generally did not exceed 5% of an

3

employee's working time.  Id. ¶ 18.  Jeschke sought to curtail Gairloch's

telecommuting because he alleged concern over Gairloch's availability and

performance, and because it was out of line with his expectations for other

employees under his supervision.  Id. ¶ 19.  Jeschke began taking notes on when

Gairloch was not in the office, when he would leave for an early lunch or return

late, and also documented Gairloch's telecommuting time.  Id.  ¶ 13.

Jeschke was additionally concerned with Gairloch's completed work order

total for 2009, which was about a third of one of his peers.  Id. ¶¶ 15–16.  The

reliability of this metric for discerning productivity is disputed by the Parties,

however, because some work orders take much longer to complete than others.

Pl.'s Br. Opp'n 13, Oct. 8, 2014, ECF No. 29 [hereinafter Pl.'s Br. Opp'n].

On September 9, 2010, Gairloch submitted a written complaint to Emily

Enselmi, the Interim Director of Network Planning & Integration, complaining

generally about Jeschke's "unprofessional" conduct and monitoring of Gairloch.

Def.'s SOF, ¶ 20.  The written complaint did not include any allegations of

unlawful discriminatory conduct.  On September 30, 2010, Jeschke, Enselmi, and

Penn State Human Resource employee Susan Morse, met with Gairloch concerning

his complaint letter.  The Parties dispute whether they discussed Jeschke's

concerns about Gairloch's telecommuting at that meeting.  See id. ¶ 22; Pl.'s SOF,

4

¶ 22.  Gairloch did testify that "around Christmas of that year [2010], in the December time frame, [Jeschke] told me he intended to give me a really poor review so that he would take away my telecommuting."  Def.'s SOF, ¶ 23.  Jeschke remained concerned about Gairloch's productivity, as he completed sixty-four (64) total work orders in 2010, while his three colleagues completed one hundred five (105), one hundred fifty-four (154), and fifty-seven (57) each.  Id. ¶ 26.

Around January 19, 2011, Penn State and Gairloch entered into an agreement attempting to resolve the telecommuting dispute.  Gairloch would be permitted to telecommute up to twenty percent (20%) of his time for a trial period, as long as he was available and met a number of other conditions identified in the agreement.  Id. ¶ 24.  Under Penn State policy, "[t]he telecommuter's manager has the authority to terminate the telecommutting arrangement at any time."  Id. ¶ 25.

On April 4, 2011, Gairloch submitted another written complaint regarding Jeschke in a letter directed to Steve Updegrove, Senior Director of Telecommunications & Networking Services.  Gairloch generally complained of "ongoing unprofessional, disrespectful, harassing and retaliatory treatment of me."  Id. ¶ 29.  Gairloch did not allege that he was harassed on the basis of his status in a protected class, that he was retaliated against for engaging in protected activity, nor any unlawful discrimination.  Id.

In the letter, Gairloch noted that "last week [Jeschke] informed me that he was going to give me a less favorable review this year . . . he has already informed me of the baseless lower performance rating he has for me . . . [and that he intended to give Gairloch] a poor rating/review on my SRDP [Staff Review and Development Plan] this year." Id. ¶ 30. The letter further stated that Jeschke "is not at all receptive to anything that deviates from his attempt at forcing me out of telecommuting altogether." Id. ¶ 31.

On April 7, 2011, Gairloch contacted Penn State's Affirmative Action Office (AAO) associate director Carmen Borges, and met with her the following day. Borges generally addresses compliance with nondiscrimination laws and complaints of discrimination, and has served as associate director for about twenty-six (26) years. Borges testified that, although she generally handles complaints of unlawful discrimination, she also often handles issues involving employee conflict that do not involve unlawful discrimination.[1] Gairloch testified that he initiated the

---

[1] Specifically, Borges stated in her deposition:

[W]e get plenty of people that come to our office with issues that hey are having problems and conflicts, and so we do get involved in trying to – trying to resolve it . . . oftentimes people don't know where to go or they don't want to go to their HR, which would be the place to go. And for some reason they find our office and they go and there's a problem and we get involved to try to resolve it to that extent.

Def.'s App. Mot. Summ. J., Ex. 5, 5:8–23, Aug. 25, 2014, ECF No. 23-5 [hereinafter Def.'s App.].

meeting because: "[I] didn't know what was going on with [Jeschke] . . . he was acting really weird and I wanted it to stop, and I wanted somebody there at Penn State to finally look into the 'it' issues." Id. ¶ 36.

At the meeting, Borges specifically asked Gairloch if Jeschke had done anything "related to some kind of legal definition of affirmative action." Id. ¶ 37. The only thing Gairloch could recall is that "in a one-on-one meeting back in 2010, in the summer sometime," Jeschke had informed Gairloch that he "made a lot more money [about $17,000] than the next oldest person within their group." Pl.'s SOF, ¶ 38. Borges denies that Gairloch ever conveyed this statement to her, and Jeschke denies ever making the statement.[2] Gairloch did not know who the next-oldest employee was at that time, did not know that person's salary, and did not know whether Jeschke knew his age at the time. Rich Santillo is less than one year

---

[2] Borges deposition proceeded as follows:

> Q: If Mr. Gairloch had said something to you in the course of your conversation to the effect of that his supervisor had told him he made $17,000 more than the next oldest person, would that have been something that caused you to inquire whether this was an age discrimination issue?
> A: I wouldn't know.  That statement in itself is not—it's nothing.
> Q: Is it possible that when, if he told you that, that you might have said something to the effect of, sounds like it could be age discrimination, let me look into this more?
> A: No.
> Q: You don't think that's possible?
> A: No, that didn't happen.  I didn't hear the thing of age at all.

Def.'s SOF, Ex. 5, at 13:2–17.

younger than Gairloch, and Timothy Bastian is several days older than Gairloch. Def.'s SOF, ¶ 40.

Gairloch does not indicate that he believed he was making a complaint of unlawful discrimination to Borges at the time.  See Def.'s App., Ex. 23-1, at 90: 1–25; 91: 1–10; 93:6–9, 17–20.  Other than the alleged statement regarding the next oldest employee, Gairloch is not aware of Jeschke making any ageist remarks.

In late April 2011, Gairloch received a poor performance evaluation from Penn State.  The performance evaluation (Staff Review and Development Plan or SRDP) is initially created by the employee under review before being submitted to the employee's supervisor for completion, and includes the employee's specific accomplishments, progress during the preceding year, professional development activities, and contributions to Penn State.  Def.'s SOF, ¶ 45.  Gairloch met with Susan Morse, Mark Katsouros, and Jeschke to go over his SRDP on April 19, 2011.  At some point during 2011, Mark Katsouros, Jeschke's direct supervisor, took over as Gairloch's direct supervisor.

The SRDP rated Gairloch's performance as "partially meets expectations," the second-lowest rating on a scale of five, but did include some positive comments noting good feedback from customers.  Def.'s App., Ex. 23-6, at 172–84.  The SRDP also noted Jeschke's criticisms of Gairloch's late arrivals,

extended lunch breaks, and absences.  It included specific recommendations to help Gairloch improve his performance.  The SRDP read that "unless we [Penn State] see immediate improvement in his job knowledge, productivity, time management skills and judgment we will pursue other options, such as formal performance improvement process . . . ." Id.  Gairloch submitted a written rebuttal to his SRDP that states: "it has been previously documented that [Jeschke] told me in December he intended to orchestrate my fall in performance and use it as a reason for terminating my telecommuting arrangement." Id., at 185.

In the weeks following this meeting, Jeschke and Gairloch's relationship deteriorated, and they had several brusque interactions.  The events were documented in part in a letter to Gairloch, summarizing a discussion that Katsouros and Morse had with Jeschke on May 16, 2011.  In the discussion, Jeschke asserted that Gairloch was attempting to intimidate him, glared at him, gave him cold stares, walked directly at him when they passed in the hall so that Jeschke would have to move out of the way, slammed doors, and generally disrupted the workplace.  Def.'s SOF, ¶ 55.  Gairloch admits he was not cordial with Jeschke, but stated that he believed Jeschke was fabricating these incidents in an effort to retaliate against him.  Pl.'s SOF, ¶ 55.  The letter concluded with a warning that, if Gairloch's behavior did not stop, he would face formal disciplinary action "up to and

including dismissal" under Penn State's applicable policies.  Def.'s SOF, ¶ 58.

On June 9, 2011, Gairloch filed complaints with the PHRC and the EEOC that generally alleged retaliation for Gairloch's AAO visit in the form of his poor performance evaluation, revocation of his telecommuting privileges, and the reprimand in the May 16 letter, among other things.  Gairloch wrote an email to several Penn State employees, including Jeschke, Katsouros, and Morse, as a courtesy to inform them that he had submitted complaints to the PHRC and the EEOC.  Id. ¶ 60.

Throughout most of 2011, Jeschke and Katsouros held bi-weekly meetings with Gairloch to review his assignments and monitor his progress.  Id. ¶ 62. Gairloch and Penn State continued to disagree over Gairloch's performance and behavior.  On December 7, 2011, Jeschke, Katsourous and Morse met with Gairloch to formally place him on a Performance Improvement Plan (PIP), and to address his ongoing performance deficiencies.  Id. ¶ 73.  Pursuant to Penn State policy, the PIP identified performance deficiencies and the expected performance standards, and fixed March 6, 2012 as a date by which a failure to correct his performance deficiencies would "result in further disciplinary action, up to and including [his] dismissal."  Id. ¶¶ 68, 75.  The memorandum cites Gairloch's failure to complete tasks by established deadlines, unwillingness to adopt new

methods and progress, letting others do work for him, creating insufficient bi-weekly status reports, and maintaining an unprofessional demeanor, among other issues.

On December 20, 2011, Gairloch filed his second complaint with the PHRC and cross-filed with the EEOC.  Def.'s SOF, ¶ 81.  Penn State received notice of the charge from the PHRC on January 9, 2012.  Id. ¶ 82.

Consistent with the PIP, Jeschke, Katsouros, and Morse held bi-weekly meetings with Gairloch throughout the early months of 2012 to again address his performance and improvement under the plan.  Penn State reports that he continued to exhibit the problematic performance and behavior.  Gairloch responds with an allegation that Penn State fabricated the issues in an attempt to obscure its retaliation against Gairloch because of his age related complaints to the PHRC and EEOC.  Penn State asserts that Gairloch's poor performance continued throughout January and February 2012, despite numerous meetings in which Giarloch was told to improve or face termination.  A Memo of Conversation from the bi-weekly meeting on February 29, 2012, warned Gairloch that he was not taking his PIP seriously, that his job was at stake, and that he had until March 14, 2012 to correct

his deficiencies.[3]

On March 14, 2012, Jeschke, Katsouros, and Morse met with Gairloch for the final time to formally terminate his employment.  In addition to documentation provided throughout the PIP on Gairloch's alleged performance deficiencies, Katsouros provided Gairloch with a termination letter dated March 19, 2012, that summarized his alleged shortcomings.

Gairloch filed his third PHRC complaint on March 22, 2012, and cross-filed it with the EEOC.  This complaint raised only one charge of retaliation for Gairloch's termination from Penn State, which received formal notice of the charge on May 23, 2012.  After these events, Gairloch filed the instant suit on April 10, 2013.

## II.   DISCUSSION

### A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is "material" where it "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>,

---

[3] The original March 6, 2012 date for conclusion of the PIP was moved to March 14, 2012 in order to accommodate a vacation Gairloch scheduled for the week of March 6.

477 U.S. 242, 248 (1986).  A dispute is "genuine" where "the evidence is such that

a reasonable jury," giving credence to the evidence favoring the nonmovant and

making all inferences in the nonmovant's favor, "could return a verdict for the

nonmoving party."  Id.

The burden of establishing the nonexistence of a "genuine issue" is on the

party moving for summary judgment.  In re Bressman, 327 F.3d 229, 237 (3d Cir.

2003) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 331 (1986) (Brennan, J.,

dissenting)).  The moving party may satisfy this burden by either (i) submitting

affirmative evidence that negates an essential element of the nonmoving party's

claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is

insufficient to establish an essential element of the nonmoving party's case.  Id. at

331.  "A party asserting that a fact cannot be or is genuinely disputed must support

the assertion by . . . citing to particular parts of materials in the record, including

depositions . . . ."  FED. R. CIV. P. 56(c)(1)(A).

Where the moving party's motion is properly supported, the nonmoving

party, to avoid summary judgment in his opponent's favor, must answer by setting

forth "genuine factual issues that properly can be resolved only by a finder of fact

because they may reasonably be resolved in favor of either party."  Anderson, 477

U.S. at 250.  For movants and nonmovants alike, the assertion "that a fact cannot

be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1); see also Anderson, 477 U.S. at 248–50.

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003). Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)), the court may . . . consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. BWM, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

### B. Plaintiff Does Not Establish A *Prima Facie* Retaliation Claim

In the wake of the events described above, Gairloch brought this action

14

against Penn State under the Age Discrimination and Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 955 et seq.  Both the federal and state claims are considered under the same analytical framework.  See, e.g., Greenawalt v. Clarion Cnty., 459 Fed. App'x 165, 168 n.1 (3d Cir. 2012); Vernon v. A&L Motors, 381 Fed. App'x 164, 166 n.5 (3d Cir. 2010).

Under the ADEA, "[i]t shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).  To prevail on an intentional age discrimination claim under the ADEA or PHRA, a plaintiff must show that his or her age "actually motivated" or "had a determinative influence on" the employer's adverse employment decision.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (internal quotations omitted).  "A plaintiff can meet this burden (1) by presenting direct evidence of discrimination, see Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or (2) by presenting indirect evidence of discrimination that satisfies the familiar three-step

framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 1101 (1973)." <u>Fasold v. Justice,</u>409 F.3d 178, 183–84 (3d Cir. 2005).

Because Gairloch did not present "direct evidence that [the employer] placed

substantial reliance on factors whose consideration is forbidden"[4] in reaching its

decision to take adverse employment action, this case is analyzed under the

burden-shifting analysis established by the Supreme Court of the United States in

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See, e.g.,</u> <u>Fasold</u>, 409

F.3d 178

Under the <u>McDonnell Douglas</u> framework, a plaintiff's claim proceeds

through a three-step analysis.  <u>See</u> <u>McDonnell Douglas Corp.</u>, 411 U.S. at 801–06;

<u>Morrissey v. Luzerne Cnty. Cmty.</u>, 117 Fed. App'x 809, 812 (3d Cir. 2004).  First,

the plaintiff must establish a *prima facie* case of discrimination, producing

evidence for each element of the claim.  <u>See</u> <u>Monaco v. Am. Gen. Assur. Co.</u>, 359

F.3d 296, 300 (3d Cir. 2004).  If the plaintiff satisfies this requirement, the burden

of production then shifts to the defendant "to articulate some legitimate, non-

discriminatory reason" for its action.  <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802.

Finally, if the defendant does articulate a legitimate motive, the burden then shifts

back to the plaintiff who must demonstrate "by a preponderance of the evidence

---

[4] <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 288, 271 (1989).

16

that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).   The Court begins its analysis scrutinizing Plaintiff's attempt to establish a *prima facie* case.

      1.    *Prima Facie* Case

"To establish a prima facie case of proscribed retaliation under either the ADEA or the PHRA, a plaintiff must show: (1) that s/he engaged in a protected employee activity; (2) that s/he was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action." Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).   In the case *sub judice*, the Defendant challenges the adequacy of the Plaintiff's *prima facie* case on the first and third elements of the test.   Stated otherwise, the Defendant asserts that the Plaintiff did not initially engage in a protected activity, and in the event Plaintiff did, there is no causal connection between the protected activity and the adverse employment actions.   The Court addresses these issues *seriatim*.

      a.    *Gairloch's Meeting with the AAO Did Not Constitute Protected Activity Under the Facts of His Claim*

Gairloch alleges that he engaged in three instances of protected conduct: making a complaint to Penn State's Affirmative Action Office on April 8, 2011;

17

and filing two complaints each with the EEOC and PHRC, once on June 9, 2011, and once on December 21, 2011.  Gairloch's reports of alleged discriminatory conduct to the EEOC and PHRC are hallmark protected conduct for the purposes of a *prima facie* case.  Penn State challenges Gairloch's complaint to the AAO, however, alleging that it did not constitute protected activity because Gairloch lacked a reasonable good-faith belief that he was reporting unlawful age discrimination at the time.  Gairloch failed to produce evidence or create a material dispute of fact to support the inference that he did hold such a belief at the meeting.

The ADEA does not protect general complaints of unfair treatment that are not specifically complaints about age discrimination.  Barber v. CSX Distrib. Servs., 68 F.3d 694, 701 (3d Cir. 1995).  "[T]he employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful . . . ." Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006).

The undisputed evidence of record establishes that Plaintiff did not hold an objectively reasonable belief that he opposed unlawful discrimination when making his AAO complaint.  At Gairloch's deposition, he testified as follows:

> Q: What specifically did you report to [Carmen Borges in the AAO meeting]?
> A: Well, I believe what we just talked about, you know, she asked me about what [Jeschke] was doing, you know, what the issues were I was having, and I told her about it.
> And at some point, I mentioned to her – she had asked me,

actually, you know, if he had done anything related to – because she basically conveyed to me that she couldn't get involved if it wasn't related to some kind of legal definition of affirmative action, and she asked me about certain things related to the, you know, those areas, and I said, the only thing, I recall, as I recall, is that at one point, [Jeschke] had made a comment to me regarding that I made a lot more money than the next oldest person within our group.

     Q: When did [Jeschke] make that comment to you?

     A: I believe that that was in a one-on-one meeting back in 2010, in the summer sometime.  It was a recollection of a comment.  I thought it was a strange comment at the time, but I just didn't make anything out of it.  But she was asking me about things related to that, so I told her that was the only thing I really recall.

. . .

     Q: Did you consider the comment about making $17,000 more than the next oldest co-worked to be an agist [sic] remark?

     A: Not at the time.

. . .

     Q: Prior to April 8, 2011, did you believe Kurt Jeschke was discriminating against you on the basis of your age?

     A: No, I had no reason to believe that.

Def.'s Ex. 23-1, at 90: 1–25; 91: 1–10; 93:6–9, 17–20.  Gairloch has offered nothing else in the record to dispute these material facts.  Accordingly, Gairloch failed to demonstrate that he had a reasonable good-faith belief that his report to the AAO on April 8, 2011 involved a specific complaint of age discrimination.

Because Plaintiff's subsequent complaints to the EEOC and PHRC do constitute protected conduct for the purposes of his retaliation claim, and because

the Plaintiff ultimately did experience adverse employment decisions, the Court

turns to the causation element of the *prima facie* case.

> b.      *Gairloch Does Not Establish Causation*

The third element that a plaintiff must establish for a *prima facie* case of

retaliation is to show "that there is a causal connection between the protected

activity and the adverse action."[5]  Fasold, 409 F.3d at 188.  One means of

establishing a causal connection between the protected activity and adverse action

is to demonstrate temporal proximity between these events.  See, e.g., Shaner v.

---

[5] Judge Morton I. Greenberg, writing for the Third Circuit in an opinion addressing the causation element of a retaliation claim in another area of law but articulating broadly applicable principles, emphasized the importance of judicial scrutiny of the causation issue:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate.  Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take.  The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individuals capacities, and the actors surely would want to avoid such unpleasant events.  Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds.  Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct.  In this regard we recognize that often public actors . . . must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267–68 (3d Cir. 2007).

Synthes, 204 F.3d 494, 505 (3d Cir. 2000).  Demonstrating an employer's

continued pattern of antagonism after the employee's protected activity may also

establish the requisite causation.  See Robinson v. Southeastern Pennsylvania

Transp. Auth., Red Arrow Div., 982 F.2d 892 (3d Cir. 1993).  Gairloch argues both

of these theories attempting to establish causation, and the Court addresses them in

turn.

> i.     *Gairloch Cannot Establish Causation Based on*
> *Temporal Proximity*

"[T]emporal proximity between the employee's protected activity and the

alleged retaliatory action may satisfy the causal link element of a prima facie

retaliation claim, at lease where the timing is 'unusually suggestive of retaliatory

motive.'" Id. (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir.

1997)).  "[T]he mere fact that adverse employer action occurs after a complaint

will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a

causal link between the two events."  Robinson v. City of Pittsburgh, 120 F.3d

1286, 1302 (3d Cir. 1997).

Writing for the United States Court of Appeals for the Third Circuit, Judge

Thomas M. Hardiman recently summarized the law on the issue of temporal

proximity in this circuit:

> We have found that a temporal proximity of two days is unusually

21

suggestive of causation, <u>see</u> <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708
(3d Cir. 1989) (reversing summary judgment for the defendant when
plaintiff was fired two days after his employer received notice of his
EEOC complaint), but have held that a temporal proximity greater
than ten days requires supplementary evidence of retaliatory motive,
<u>see</u> <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280 (3d Cir.
2000) (finding that "where the temporal proximity is not so close as to
be unduly suggestive," the appropriate test is "timing plus other
evidence"); <u>see also</u> <u>Williams v. Phila. Hous. Auth. Police Dep't</u>, 380
F.3d 751, 760 (3d Cir. 2004) (two months is not unusually
suggestive); <u>LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n</u>, 503 F.3d
217, 233 (3d Cir. 2007) (three months is not unusually suggestive).

<u>Blakney v. City of Philadelphia</u>, 559 Fed. App'x 183, 186 (3d Cir. 2014)

(Hardiman, J.).

The Court measures temporal proximity from the date on which the litigant

engaged in his first protection action.  <u>Id.</u>  In this case, Gairloch's first protected

action was his PHRA and EEOC complaint filed on June 9, 2011.  Approximately

five months after this complaint, Penn State met with Gairloch and issued a

memorandum detailing his alleged performance failures.  A month later, and

therefore six months after Gairloch's protected act, Penn State placed Gairloch on

his formal Performance Improvement Plan.  The five to six month interval between

Gairloch's protected activity and the adverse employment action is not sufficient

temporal proximity to establish causation without other evidence.  <u>See, e.g.</u>,

<u>Williams</u>, 380 F.3d at 760.

Gairloch filed his second complaint to the PHRA and EEOC on December

22

20, 2011.  The next distinct adverse employment action Gairloch experienced was

his termination on March 14, 2012.  This period of three months, without

corroborating evidence, is insufficient to establish causation based solely on the

temporal proximity of these events.  Id.

Gairloch's reliance on Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005), does

not establish the requisite causation in this case because the facts of that case are

materially different from this case.  In Fasold, the Third Circuit found that the

plaintiff established the causation element of a *prima facie* case when a three-

month separation between protected conduct and the adverse employment decision

existed *in conjunction with* the employer's repeated references to the employee's

protected conduct, which included: the employer questioning the employee about

his protected conduct at a grievance hearing; the employer specifically including a

reference to the protected activity in the written denial of the employee's

grievance; and, the employer testifying that the employee's protected conducted

"irritated" him and caused him to view the employee as suspect.  Fasold, 409 F.3d

at 190.

In the case before the Court, Gairloch produced no similar additional facts

comparable to the evidence that was dispositive in establishing causation in Fasold.

The single fact Gairloch offers to supplement the attenuated temporal proximity

between his protected actions and adverse employment decisions is his claim that

Katsouros stated, "I know you have been working with Affirmative Action," at a

meeting after Gairloch's contact with the AAO, but before his PHRA/EEOC

complaints.  Assuming this statement to be true, it still fails to establish causation

under the "timing plus other evidence" when compared to the facts of <u>Fasold</u>.  <u>See</u>

<u>Fasold</u>, 409 F.3d at 190; <u>see also</u> <u>Farrell</u>, 206 F.3d at 280.

First, Katsourous merely acknowledged the fact that Penn State was aware

Gairloch had met with the AAO.  This does not raise an inference that he knew

Gairloch had complained of any unlawful discrimination, or age discrimination

specifically, because the AAO often receives complaints that involve workplace

disputes rather than instances of unlawful discrimination, as Borges testified.  <u>See</u>,

*supra*, at 6.

Second, as previously articulated, Gairloch's meeting with the AAO does

not constitute protected conduct for the purposes of a retaliation claim based on

age discrimination, because Gairloch did not hold a good-faith belief of age

discrimination at the time of the AAO meeting.  If Gairloch himself did not hold a

good-faith belief that he was complaining of age discrimination at the time, it is not

reasonable to infer from these facts that Katsouros believed that he made an age

discrimination complaint.

Third, Katsouros did not question Gairloch about his activity, did not

include this activity as part of any of the myriad written memoranda following

Gairloch's performance meetings, and has not testified to having any animus

against Gairloch, which was the type of evidence necessary to establish causation

in Fasold.  See Fasold, 409 F.3d at 190.  Accordingly, it is this Court's view that

Fasold is dissimilar to the facts of this case.  In sum, Gairloch failed to demonstrate

"timing plus other evidence" necessary to establish causation.  Farrell, 206 F.3d at

280.

> ii.    *Penn State's Proceeding Along Lines Previously
>        Contemplated Does Not Establish Causation*

In the absence of establishing causation by temporal proximity between the

protected activity and adverse employment action for the purposes of his *prima*

*facie* case, Gairloch alleges that Penn State engaged in an intervening pattern of

antagonism present throughout the events of this case.  Gairloch proffers seven

distinct incidents to demonstrate this alleged pattern of antagonism in retaliation

for Gairloch's protected activities: (1) Penn State removing Gairloch's

telecommuting privileges around March 31, 2011; (2) assigning Gairloch work for

which he had no previous training or experience throughout the period of time he

engaged in protected activities up through his termination on March 14, 2012; (3)

Gairloch receiving a poor performance evaluation around April 19, 2011; (4)

Gairloch's allegations that Penn State manufactured false allegations of insubordination from May 16, 2011 up until his termination; (5) the memorandum of December 15, 2011 detailing his performance deficiencies and culminating with the PIP; (6) Penn State's failure to hire or promote Gairloch to Information Technology Manager, a position for which he applied prior to April 8, 2011 and which was then filled by another person in December 2011; and, (7) Penn State's terminating Gairloch's employment on March 14, 2012.

Gairloch cites one case to support his theory of causation demonstrated by a pattern of antagonism, entitled Robinson v. Southeastern Pennsylvania Transp. Auth., Red Arrow Div., 982 F.2d 892 (3d Cir. 1993).  In that case, the Third Circuit found that the trial court could reasonably find sufficient evidence of causation when the employer subjected the plaintiff "to a constant barrage of written and verbal warnings . . . inaccurate point totalings, and disciplinary action, all of which occurred soon after plaintiff's initial complaints and continued until his discharge."  Robinson, 982 F.2d at 985.

The case at bar is distinct from Robinson, however, because several of the patterns of adverse employment actions began *prior* to Gairloch meeting with the AAO or engaging in protected activity.  In Robinson, the court specifically noted that *all* of the adverse employment activity directed at plaintiff began *after* he

engaged in protected activity.  Id.  Accordingly, Robinson does not mandate a finding of causation on these facts.

Furthermore, the Supreme Court has recognized that "employers need not suspend previously planned" actions upon learning of protected activity.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).  "[T]heir proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  Id.

Performance issues existing prior to protected activity may undermine a plaintiff's attempt to establish causation based on an employer's actions in response to those performance concerns.  See, e.g., Shaner v. Synthes, 204 F.3d 494, 504 (3d Cir. 2000).  When negative performance evaluations pre-date any protected activity, courts should not infer a causal link between any subsequent protected activity and an employee's eventual termination.  Verma v. Univ. of Pennsylvania, 533 Fed. App'x 115, 119 (3d Cir. 2013).

In the case before the Court, Gairloch admits to poor relations with his employer before he engaged in protected activity.  Gairloch was aware that Jeschke intended to give him a poor performance review as early as December 2010.  Def.'s SOF, ¶ 23; Pl.'s SOF, ¶ 23.  Furthermore, the performance failures cited by Penn State for Gairloch's eventual placement on a PIP and subsequent termination

are similar activities that were documented as problematic before Gairloch engaged

in protected activities.  Accordingly, Penn State's proceeding along lines

contemplated prior to any protected activity by issuing Gairloch a poor

performance review in April 2011, and then taking actions to address performance

issues that began before and continued after Gairloch's protected activity further

defeat Gairloch's attempt to establish causation.  See, e.g., Verma, 533 Fed. App'x

at 119; Shaner, 204 F.3d at 504.

> iii.    No Causal Connection Between Gairloch's Protected
>          Activity and Penn State's Office of Physical Plant's
>          Declining to Hire Him

In addition to his claims against Penn State within his department, Gairloch

also claims that Penn State's Office of Physical Plant (OPP) refused to hire him for

an open position in retaliation for his protected activity.  Be that as it may,

Gairloch also fails to establish the requisite causal connection for the purposes of

his *prima facie* case on this allegation.

As a primary matter, Gairloch has submitted no evidence suggesting that

anyone involved in the hiring process at OPP had any knowledge of his protected

activity.  "Knowledge of an employee's protected conduct is an essential element

of establishing a causal connection."  Warfield v. SEPTA, 460 Fed. App'x 127,

132 (3d Cir. 2012).  OPP's Human Resources Manager, Susan Rutan, maintains

28

that she did not know about Gairloch's PHRC/EEOC complaint or his AAO visit during the entire hiring process.  See Def.'s App., Ex. 23-7.  To the best of her knowledge, no one on the hiring committee knew of Gairloch's complaints either.

The only scintilla of circumstantial evidence Gairloch offers to dispute this and attempt to establish causation is his vague allegation that "Human Resource managers routinely communicated with each other, especially concerning the hiring or transfer of individuals . . . [and] any and all members of the hiring committee would have had undoubted access to Plaintiff's personnel file . . . ." Pl.'s SOF, ¶ 136.  This allegation attempts to create the strained inference that, because human resource personal may have had general access to employee personnel files, someone on the hiring committee undoubtedly was aware of Gairloch's complaints, and those complaints caused the committee not to hire him. Gairloch fails to support the facts underlying this attenuated chain of inferences by specific citations to facts of record, as Rule 56 requires.  See FED. R. CIV. P. 56.

Moreover, accepting the facts and inferences in the light most favorable to Gairloch, even if the committee had access to his files, did indeed access his files, and was aware of his complaints, there is no evidence to support that that potential awareness caused OPP not to hire Gairloch.  Gairloch simply provides no evidence from which this speculative conclusion arises as a reasonable inference.  In point of

fact, Gairloch was not selected out of more than one hundred fifty (150) applicants for the position.

Furthermore, the attenuated temporal proximity between Gairloch's first protected activity and OPP's declining to hire Gairloch does not suggest causation. OPP notified Gairloch that it had hired someone else for the position on December 13, 2011, between his first protected activity on June 8, 2011, and his second on December 20, 2011.  Without additional evidence which Gairloch fails to supply, the six-month period after his relevant protected activity and the failure to hire does not establish causation.  See, e.g., Williams, 380 F.3d at 760. Accordingly, Gairloch's retaliation claim for OPP's refusal to hire him fails because he cannot proffer sufficient evidence of a causal connection to establish a *prima facie* case.

Because Gairloch failed to establish a *prime facie* case of retaliation based on age discrimination, the Court need not proceed to consider the second and third prongs of the McDonnell Douglas test.

## III.   CONCLUSION

Gairloch failed to establish a *prima facie* case of retaliation for complaints of alleged age discrimination since he did not produce evidence or demonstrate disputed material facts to establish causation between Gairloch's protected activity and Penn State's adverse employment actions.  Because Gairloch did not establish

a *prima facie* case of retaliation, summary judgment for the Defendant is proper.

An appropriate Order follows.

BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge